324-0213 consolidated with 324-0376, a state of Timothy F. Degnan, deceased, Wenrock Company and Elderwood Corporation, Japanese by Roger Platt, versus Julie A. Degnan and Timothy M. Degnan, as independent co-executives of the state of Timothy F. Degnan, announced by Charles Gearing. Mr. Gearing, you may proceed. Thank you, Your Honor. May it please the Court. Good morning, Justices. My name is Charles Gearing, and I represent the estate of Timothy Degnan in this matter. With me this morning are my co-counsel, Michael Durkin, and Caroline McAuliffe. Also in the courtroom this morning are our clients, Julie and Tim Degnan, the co-executives of their father's estate, and some other members of the Degnan family. This case is about whether a shareholder agreement requires the estate to sell shares of stock that Tim Degnan owned before his death in a company called Glenrock. The estate doesn't want to sell those shares. It wants to keep them. Glenrock insists that the estate is required to sell those shares under the provisions of a 42-year-old shareholder agreement for another company called Marble. Marble merged into Glenrock 35 years ago. Glenrock asserts that under the shareholder agreement that the Marble shareholders entered into, the estate has to sell the shares for adjusted book value, which is far less than their market value. Glenrock argues that the Marble shareholder agreement applies based on a plan of merger. It's a document that's filed with the Secretary of State. It's not an agreement of any kind. But Glenrock claims that under the plan of merger, which doesn't reference the Marble shareholder agreement, and which none of the Marble or Glenrock shareholders sign, the estate is required to sell these shares. There's no evidence that the Marble agreement has ever been applied to shares in Glenrock in the 35 years since the merger took place. The Marble shareholder agreement was signed by Marble and all of the Marble shareholders. But to affirm the probate court's decision here, you would essentially have to conclude that Marble, one party to that agreement, acting alone through this plan of merger, was able to effectively amend the Marble shareholder agreement so that it applies to the Glenrock shares. There's no basis in the law for that conclusion. Tim Degnan originally acquired his shares in Marble beginning in 1987. The Marble share certificates included a legend on its reverse side that said that the shares were subject to an agreement, a copy of which could be obtained from the Secretary of the company. That agreement that was referenced on the Marble share certificates was the Marble shareholder agreement, which was entered into in 1983. It was signed on behalf of Marble Company and all the shareholders under Section 2A of that Marble shareholder agreement. On the death of a shareholder, the shares had to be sold or redeemed by the company for adjusted book value, not market value. As I said, Marble merged into Glenrock in 1990. At that time, Mr. Degnan received 6,600 shares of Glenrock in exchange for his Marble shares. Those shares are now an asset of the estate. There is no Glenrock shareholder agreement. Glenrock claims that the Marble agreement applies based on this plan of merger, which I mentioned. Article 2A4, in particular, of the plan of merger is the provision on which Glenrock relies. And it's also the provision cited by the probate court in entering its decision in this matter in favor of Glenrock. And that plan of merger, Article 2A4 of the plan of merger, says that all corporate acts of Marble and its shareholders constitute the acts of Glenrock. It does not say, and it could not say, that the actions of Marble and its shareholders constitute the acts of the Glenrock shareholders. The Glenrock shareholders didn't sign that plan of merger. Glenrock did. So, you know, the fact that it says that the acts of Marble constitute the acts of Glenrock is appropriate, given that Glenrock signed it. That's also a provision of the Business Corporations Act, that the survivor of a merger is responsible for liabilities of the extinguished company. So it's not a novel concept. The plan of merger doesn't purport to be an agreement. No Marble or Glenrock shareholder signed it. It was only signed by the president of Marble and Glenrock, which was the same person, a gentleman named Michael Watson. It doesn't reference, purport to incorporate, or even mention the Glenrock shares or the Marble shareholder agreement. It doesn't mention any transfer restrictions. The Glenrock share certificates are printed on the same fill-in-the-blank forms that Marble used for its stock certificates. And those stock certificates are in the record. They're in our appendix at A30 and A34. If you look at the Marble and Glenrock share certificates, they're basically identical. They use the same form, same form number from the same office supply company. The Glenrock shares also include the same legend on the back of them, referencing an agreement under which the shares were restricted. But there is no Glenrock shareholder agreement. So that reference on the back of the share, that legend on the back of the share certificates has no legal effect. After Mr. Degnan died, Glenrock asserted that the estate was required to sell its shares for adjusted book value. The estate rejected that offer, and that led to this dispute. The probate court, as I said, concluded that the Marble shareholder agreement applies to the Glenrock shares because the plan of merger calls for it. That was the court's reasoning. The plan of merger, as I said, doesn't reference the Marble shareholder agreement. It wasn't signed by any of the Marble shareholders or the Glenrock shareholders. That plan of merger isn't an agreement of any kind. The Marble shareholder agreement does not apply to the Glenrock shares. The Marble shareholder agreement is a contract. This is a contract case, and it's governed by straightforward, longstanding principles of contract law. Because the Marble shareholders agreement is a contract, the party's rights and obligations are limited to its terms. They're limited to what they actually agreed to because mutual assent is required for any contract, which we all learned in first-year contracts. The terms of the Marble shareholder agreement include no mention of the Glenrock shares. That agreement expressly states that it applies only to Marble shares. It expressly states that it's only effective for as long as a shareholder owns less than 100% of the Marble stock. So under Section 11.50 of the Business Corporations Act, when the merger occurred, Glenrock was the surviving corporation, and Marble and its shares ceased to exist. So by its terms, the Marble shareholder agreement expired at the time of the merger and had no further effect. The Marble agreement also provides that any change or modification has to be in writing, and it has to be signed by all parties. There is no evidence in this case, nothing in the record, to suggest that the Marble shareholders ever agreed to extend the scope of the Marble shareholder agreement to include their Glenrock shares. And there's no evidence in the record to suggest that the Glenrock shareholders ever agreed that their Glenrock shares would be limited by the transfer restrictions in the Marble agreement. There is a strong presumption in Illinois law against construing a contract to include provisions parties easily could have included but didn't. Here, the Marble shareholders easily could have provided that the Marble shareholder agreement would continue to be in effect with regard to shares in the surviving corporation in the event of a merger. That didn't happen. The Marble agreement includes no such provision. So there's no basis to conclude that the Marble agreement applies to the Glenrock shares. The plan of merger certainly does not and certainly could not expand the scope of that agreement. The plan of merger was the sole basis for the probate court's decision here, and it's the sole basis for Glenrock's argument that the Marble agreement applies. But the plan of merger provides no evidence that the Marble shareholder agreed at any time that their Glenrock shares would be subject to the transfer restrictions in the Marble agreement. First, it doesn't say the Marble agreement applies to the Glenrock shares. Section 2A.4 of the plan of merger, the provision that Glenrock relies on and that the probate court relied on in reaching its decision in this matter, only says that Glenrock is bound by the actions of Marble and its shareholders. It does not say Glenrock's shareholders are bound by the actions of Marble and its shareholders, and it couldn't because those Glenrock shareholders were not parties to the plan of merger, even if it were an agreement. There's no way that one party to an agreement, Marble, could extend the scope of the agreement without the assent of the other parties to that agreement. Glenrock has access to all of the corporate records of both Glenrock and Marble, and it has produced no evidence, in this case, of any agreement of the Glenrock shareholders to adopt the Marble shareholder agreement. There's no Glenrock shareholder agreement in the record. No such agreement exists. There is no shareholder resolution adopting the Marble shareholder agreement and its transfer restrictions for the Glenrock shares. There is no other evidence that the Glenrock shareholders ever assented to be bound by the restrictions in the Marble agreement, and there's no evidence that Glenrock ever enforced the terms of the Marble shareholder agreement as to any other shareholder in the 35-year history since the merger of Marble into Glenrock. So the president of both companies was the same person? That's right. Right. Gentleman named Michael Watson. How many shareholders were there in these two companies? Presently, there are two. Historically, there were more than two. The time of the merger? The record is not entirely clear. I believe there were four shareholders at the time of the merger. Two of those shareholders are no longer shareholders. There's nothing in the record that suggests that when those shareholders' shares were transferred, that the provisions of the Marble shareholder agreement was applied to their shares. There's nothing in the record to suggest that that happened. Glenrock claims the estate is compelled to sell its shares for adjusted book value, but Glenrock's provided no evidence that the Glenrock shareholders ever agreed to abide by the terms of that agreement. As I said, this is a contract case. The critical issue here is did the Glenrock shareholders assent to an agreement under which their ability to transfer their Glenrock shares would be limited or restricted? And the answer is there's no evidence in the record to suggest they ever did that. Thank you. Counsel, they did accept the stock of Glenrock, correct? They accepted it? That was the exchange? The exchange. Mr. Degnan accepted 6,600 shares of Glenrock stock at the time of the merger in exchange for those. It was a one-to-four swap. He accepted those Glenrock shares, yes. And that action does not bind him to what it says of the stock itself? Well, like I said, the Glenrock share certificates have the same legend on them that the Marble share certificates had, but in the absence of an underlying agreement, there's no basis to assume that the Glenrock shareholders assented to be bound by the terms of the Marble agreement or any other particular agreement. The reference on the back of the share certificate is to some unidentified agreement. The Business Corporations Act does allow for the application of a shareholder agreement based on a restriction noted on the back of a share certificate, but there has to be an underlying agreement. The legend doesn't create the agreement. It simply references an underlying agreement, which is not present here. There is no underlying agreement. There's no evidence that the Glenrock shareholders ever assented to be bound by the restrictions in the Marble shareholder agreement or any other restrictions. The record is simply devoid of any evidence that they ever assented to be bound by an agreement, and the fact that there's an agreement that's unspecified, which is referenced on those share certificates, doesn't change the fact that there is no underlying agreement. Thank you. If there are no other questions? No. You'll have time to reply. Yes. Thank you, Judge.  Mr. Black, you may respond. Thank you, Your Honor. May it please the Court, Counsel. Good morning again. My name is Robert G. Black, and I'm here on behalf of the plaintiff-athlete in this matter. Let's put this matter in some context. At the time of the first Articles of Inquiry, I'm sorry. At the time of the shareholder agreement, there were four shareholders. At the time of the plaintiff merger, there were four shareholders. Decedent was one of those shareholders at the time of the merger. Decedent had his shares before the time of the merger. Decedent accepted those shares after the merger, and the shares had the language, the legend on the back of the restricted situation that was the same for the first set of shares and is the same for the shares that were issued after the plaintiff merger. I've heard something about there's no evidence of ever assenting to be bound by this. Well, let's take a look at the realities here. This is a gentleman, the decedent, who was very well involved with the corporation, corporations, and one of the four shareholders. That kind of is disingenuous. It actually is disingenuous. What this case goes to, actually, is under the Illinois statute, statutory scheme, under the language of these instruments, the trial court was correct in granting summary judgment. We look at Section 5.66 of the Business Corporation Act, and that says a written restriction is permissible if it's noted conspicuously. That's met here each time, each of the three times, including after the plaintiff merger. Statute also says that it would be ineffective except if it goes to a shareholder with actual knowledge of the restriction. There's no question that decedent and shareholder had actual knowledge of the restriction. So Illinois statutory law provides a fundamental basis for this to affirm the trial court's decision. Then we've got the plaintiff merger. The plaintiff merger specifically says, Article 2, Section 4, that all corporate acts, plans, policies, contracts, approvals, and authorizations of Marble and shareholders that are valid and effective immediately prior to the effective date of this merger shall be taken for all purposes as the acts, plans, policies, contracts, etc. of the surviving corporation, just as it would if the binding on that surviving corporation, just as it would to Marble. This language is clear. This language, along with the restrictive language on the back of the SOC certificates, carries today. And along with Section 5.66 of the Business Corporation Act. Again, the legend on the back, well, front of the certificates say, please see the reverse side for restriction. Essentially something along those lines. The other side, the back side says, transfer disposition or encumbrance of the shares represented by the within certificate is restricted under the terms of an agreement, half of which may be obtained from the Secretary of the Corporation. Everybody's put on notice that there is an agreement. There is an agreement. Let's look, too, at the shareholder agreement itself. Section 1 discusses restrictions on transfer. And for a corporation with four shareholders, there's good reasons for restrictions on transfer. You want to be able to control the business of the corporation. You don't want somebody coming in and taking an order that has nothing to do with the business purpose or the corporation. Section 2A says, in the event of death of a shareholder, then you must sell all shares of the corporation for some equal to the adjusted book value at the end of the month of the event. And the estate shall be obligated to offer such stock for sale or redemption within 10 days. All that's pretty clear. Section 6 says, this agreement shall be binding upon the parties, transferees, heirs, successors, and signs. Likewise, very clear. Section 5 says, the agreement will remain effective so long as any shareholder owns less than 100% of the total issued and outstanding shares of the corporation. That is not the case yet. There is no 100% ownership, so this agreement remains effective. And Section 3 specifically describes the legend, the restriction that has to be on the back of these shares. And it says, they will be endorsed with a written statement that the shares are restricted on the returns of an agreement, a copy of which is on file at the office of the corporation. And in each instance, that's what's on the back of the shares. The corporation will not issue shares unless the holder agrees to be bound in writing by its argument. Mr. Black, this is all in the Marble Shareholder Agreement, though, correct? It is in the Marble Shareholder Agreement. The issue is, how does that transfer? Well, it transfers by basically because of the continuing legend that's on the back of the shares. The back of the shares show that the restriction is still there. The client merger describes the act being the same. And the shareholder agreement to begin with, I know this is kind of, but the shareholder agreement to begin with is very specific about this restriction. And the restriction continues. And we had four shareholders, very well-versed with the business, with what was going on, with everything that was available. The plan of merger states that the shareholders did vote on this, right? Yes. The shareholders did vote on this. And we have no basis to conclude that that didn't happen? No basis. No basis to conclude it did, other than what's in the statement of merger? Well, I think so, because there are... May I go get my glass of water? I'm just kind of drying my mouth. Thank you, Roger. I think they... I'm sorry, Roger, would you repeat the question? The statement of merger says that everybody voted on it. Correct. It does. And I asked, you said there was no basis to conclude that that's incorrect? Correct. Is there any evidence that it is correct, other than what's in the statement? Other than what's in the statement, but I mean, it's right there. They all signed off on it. They all agreed to it. And the language in the statement of merger says that everything carries over, right? Correct. Correct. So, again, if you look at the statutory screen, if you look at the language of the successive instruments and documents, if you look at what's, you know, the surroundings of this situation, this applies. There was a very good basis for the restrictive language, and with this, with only four shareholders. Everybody knows what's going on. Isn't the key, though, that those four shareholders accepted the restrictive language when it became landmark? Correct. And that is evidence by what you just talked to, to Justice Anderson, in that Timothy signed that agreement. He did. The merger agreement. Absolutely. He signed it. He signed. The SOC certificates were issued. He took the SOC certificates subject to what's said in, as the restrictive language of the agreement. So, we think that... Go over the restrictive language of the agreement. Go over that. Okay. But we're talking about the restrictive language on the back of the SOC certificate. I might have... Well, it was clear in the predecessor corporation. So, how did that transfer over, in your argument, to Blenheim Shares? Well, because the... Which is a different corporation, am I correct? But the Illinois law provides that... Excuse me. The shares, the agreement does not automatically become nullified by this merger. That there is amnesia surrounding the merger that this is a continuation. Maybe better than amnesia. That there's a continuation of what? Continuation of this clause that is the restriction on movement of the shares. Now, which section is that? I'm sorry, go ahead. Which section is it under the corporate act? Well, okay. So, in terms of the shareholder agreement, we've got Section 2 and Section 3. In terms of the plan of merger, it's Article 2, Section 4. All corporate acts are the same. So, you're specifically and very clearly, you're saying the corporate act of Marble became binding on Blenheim, right? Right, yes. And the corporate act being defined as? The issuance of the stock and the stock certificate. In Marble. Where the corporate act is when they approve the merger, is that right? Yes. And by approving it, they accepted all of the responsibilities and the plans and policies with respect to Marble, that it will have the same binding effect. Well, that's your conclusion, because I'm looking to parse it out. Sure. Of course, that's your conclusion. Well, and I'm just, again, looking at the language of Section 2.4 of the plan of merger. Corporate acts and contracts. Corporate acts, policies, plans, approvals, and authorizations of Marble and its stockholders are valid and effective and shall be taken for all purposes as the acts, plans, purposes, contracts, approvals, and authorizations of the surviving corporation and shall be as effective and binding thereon as the same with respect to Marble. So, you're talking a lot about contracts, your point is. Then you're saying that the shareholders' restrictions when you were a shareholder of Marble, that that's a contract, right? The shareholder restriction went with shares. It was on the back of Marble. And with Glenn and I. Well, let's just stay with Marble. Okay. Because I'm talking about throwing the ball to Glenn and I. All of the certificates that the decedent obtained from Marble had the restrictive language on the back. Would you characterize that restrictive language as a contract? Yes. Okay. So, you're thinking that it's Article 2A.4 that that became binding on Glenrock because the article talks about contracts being taken over and assumed by the successor, Glenn. Yes. Yes, Your Honor. That's the way you throw the ball over to Glenn and I, correct? Yes, Your Honor. Okay. Thank you. Thank you, Your Honor. Well, are there any other questions that the panel may have? Your opponent argues that the agreement expired at the time that the corporation never existed. Right. Or ceased to exist, excuse me. Do you agree with that proposition? No. Then why is that? Well, because the, again, Article 2, Section 4 allows everything to continue. The same language is on the restriction. It's part and parcel. And I think that, I mean, if the trial court held that, I mean, I know we're here on Sunday judging, but that's what the trial court decided. Thank you. Thank you. Okay. Thank you, counsel. Mr. Guerin, you may reply. Thank you, Your Honor. I'd just like to make a few points in reply. There was discussion during Glenrock's argument concerning the legend on the back of the Glenrock share certificates, which I talked about earlier. That's the same legend, and Mr. Black suggests that because it's the same legend, it must be the same agreement. That is not a permissible logical leap. There is no reason to believe that the agreement referenced in the legend on the Glenrock share is the Marble shareholder agreement. Mr. Black said it is a contract. That legend constitutes a contract. If that legend is a contract, what are the terms? What are the restrictions that apply to the Glenrock shares? That legend is not a contract. If you look at Section 6.55 of the Business Corporations Act, I believe Mr. Black inadvertently called it Section 5.66, Section 6.55 allows for a shareholder agreement to be applied against the shareholder and his shares if there's a legend on the back of a stock certificate that references that agreement, but it doesn't constitute an agreement. The legend simply references an underlying agreement, and there is none here. Justice Heddle, you asked a question about whether the agreement expired, which I said it did. Under Section 11.50 of the Business Corporations Act, at the time of the merger, Marble ceased to exist. You're using the Business Corporations Act, or are you using the actual Marble agreement originally? It says that if any shareholder achieves 100%, then the agreement is over with, but that never happened, correct? Well, that's not what it says. It says the agreement ceases to have any application when any shareholder owns less than 100%. Effectively, only so long as shareholder owns less than 100%. That's right. So at the time of the merger, no shareholder owned less than 100% of the shares of Marble because those shares ceased to exist under the Business Corporations Act. So by its terms, the Marble shareholder agreement expired, and by operation of law, the Marble shareholder agreement expired. It has been the law in this state for well over a century that when the subject, when the object of a contract ceases to exist, the contract has no further legal effect. That's what happened here. The merger agreement you're saying does not adapt the conditions that were present in the stock when it was Marble stock? I think we need to be careful about the terminology we're using. You mentioned a merger agreement. The document at issue in this case, which the Promate Court relied on, is called a plan of merger. Plan of merger, excuse me. It references... That's what I'm referencing. Yeah, just to be clear, though, that plan of merger references an agreement of merger. That agreement is not in the record. Glenrock has not produced it, even though it has access to all of Glenrock's and Marble's corporate records, so we don't know what that agreement of merger says. There are also articles of merger, which Glenrock has asked this court to take judicial notice of. Justice Anderson, you asked about whether there was a vote of the shareholders. The plan of merger doesn't say that there was. The articles of merger, which our opponent has asked you to take judicial notice of, does say that there was a vote, but a vote of the shareholders, even if it occurred, and the record in this case doesn't make it clear that it ever did. There's no evidence in the record of any vote or what the result was. But even if there was a vote of the shareholders of Marble to approve the merger, that doesn't equate to assent by the Marble or Glenrock shareholders to the application of the terms of the Marble shareholder agreement to their Glenrock shares. They very well could have approved the merger without ever assenting. The Glenrock shareholders could have approved the merger without ever assenting to the application of the Marble shareholder agreement to their Glenrock shares. Mr. Black said that Tim Degnan knew of the restriction that's legended on the back of the share certificates, so he must be bound by the agreement. There's just no basis for that. There's no basis to conclude that Mr. Degnan or any of the other Marble shareholders agreed that their Glenrock shares would be bound by the terms of the Marble shareholder agreement. This is a contract case, and there are fundamental principles of contract law that if you follow, you cannot affirm the probate court's ruling. There simply is no evidence that the Marble shareholders ever agreed that their Glenrock shares would be subject to the terms of the Marble shareholder agreement, and there's no evidence that the Glenrock shareholders agreed to be bound by those terms either. I see my time is up. Questions? Thank you, Justices. I appreciate your time. Thank you, Counsel. Thank you, Counsel, both, for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue.